## THE POCOMOKE.

### (District Court, E. D. Virginia. December 29, 1906.)

**1. COLLISION—STEAM VESSELS CROSSING—VIOLATION OF RULES.**

The steamer Pocomoke *held* in fault for a collision with the government launch Daisy near the docks at Norfolk, Va., on evidence which showed that the vessels were on crossing courses, and the Pocomoke had the launch on her starboard hand, and was therefore required, by articles 19, 22, 23, of the navigation rules for rivers and harbors (30 Stat. 96 [U. S. Comp. St. 1901, p. 2885]), to keep out of the way, to avoid crossing ahead of the launch, and, if necessary, slacken her speed, or stop or reverse, none of which rules she complied with. The launch *held* not in fault for violation of article 21, requiring her to keep her course and speed, because she reversed after collision became inevitable, which was a proper maneuver to lessen the effect of the blow.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Collision §§ 34–38.]

**2. SAME—LOOKOUT.**

All that the law requires with respect to a lookout is that there shall be some one properly stationed to best observe, see, and hear the approach of other vessels; and a small launch, only 61 feet long, having her pilot house, in which her navigator stood, well forward, with open windows all around, and other members of the crew on the deck, cannot be held in fault for a collision in the daytime, in fair weather, because she did not have a lookout specially stationed, where she was the privileged vessel, entitled to keep her course and speed, and the absence of such lookout did not contribute to the collision.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Collision §§ 140–143.]

**3. SAME—BURDEN AND SUFFICIENCY OF PROOF.**

A burdened vessel, which was guilty of a clear violation of the rules of navigation which in itself was sufficient to account for a collision, cannot escape liability therefor by merely raising a doubt as to the proper navigation of the privileged vessel.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Collision, § 275.]

In Admiralty. Suit for collision.

On the morning of the 11th of August, 1903, about 8:40 o'clock, the government steam launch No. 22, known as the "Daisy," about 61 feet long, used in the transportation of employés and other persons between the Navy Yard at Portsmouth, and the city of Norfolk, while en route from the former place to the government landing in Norfolk, came into collision with the Pocomoke, a steam vessel engaged in the fishing trade, about 115 feet long, 139 tons gross, as the latter was proceeding up the Elizabeth river and the launch was about to enter her landing, and some 50 to 75 yards out in the stream. The government landing at Norfolk is immediately east of the ferryboat slip, or wharf used by the ferryboats plying between Norfolk and Portsmouth and Berkeley: the slip for the Berkeley boat being immediately west of the government landing, and the Portsmouth slip immediately west of that. The

government's case, briefly, is that its launch, under the rules of the road, had the right of way over the Pocomoke; that she was properly equipped and manned, with proper and efficient officers and lookout; that the Pocomoke, without notice or warning, negligently, recklessly, and carelessly ran upon and over the launch, and sunk the same. The Pocomoke assigns various acts of negligence against the launch, chiefly that she was proceeding at a high rate of speed; that she failed to keep her course and speed, but, on the contrary, stopped and reversed, when too late to avoid the collision, without giving notice thereof; and for failure to have and maintain a proper lookout.

L. L. Lewis, U. S. Atty.
Hughes & Little, for respondent.

WADDILL, District Judge (after stating the facts). There is not a great deal of evidence in this case, and the same may be said to be less conflicting than is usual in collision cases, and will be found in the judgment of the court to clearly establish the fact that the collision was due solely to the negligence of the navigator of the Pocomoke in not complying with the rules of navigation by keeping out of the way of the launch, or stopping or reversing, or otherwise taking necessary precautions in time to avoid the same, when it was apparent that the two vessels were in such close proximity as to endanger risk of collision.

Articles 19, 21, 22, and 23 of the rules of navigation (30 Stat. 96 [U. S. Comp. St. 1901, p. 2885]) prescribe the conduct of vessels approaching each other as in this case, and those violating them, except under circumstances contemplated by the rules, must bear the consequences if damage ensues. The orderly conduct of navigators, and the preservation of life and property of persons thus engaged, requires that these rules shall be strictly observed and followed. Article 19 provides that:

"When two steam vessels are crossing so as to involve risk of collision, the vessel which has the other on her own starboard side shall keep out of the way of the other."

Article 22:

"Every vessel which is directed by these rules to keep out of the way of another vessel shall, if the circumstances of the case admit, avoid crossing ahead of the other."

And article 23:

"Every steam vessel which is directed by these rules to keep out of the way of another vessel, shall, on approaching her, if necessary, slacken her speed, or stop or reverse."

These three rules make perfectly clear the duty of the Pocomoke. The launch was on her starboard side, and therefore had the right of way; and the Pocomoke should have kept out of her way. There were no circumstances justifying her attempting to cross ahead of the launch, and, under article 23, if it became necessary for her to avoid the collision, she should have slackened her speed, or stopped, or reversed, none of which it is pretended she did, certainly in time to avert the disaster. The obligation imposed upon the Pocomoke was to avoid the risk of collision, as well as the collision, and she cannot escape the consequences of her folly in taking chances in that respect. In-

stead of making a "close shave," she should have anticipated the danger, at least in time to have avoided the same, by slackening her speed, or stopping, or reversing. The Carroll, 8 Wall. 302–5, 19 L. Ed. 392; The New York, 175 U. S. 187, 20 Sup. Ct. 67, 44 L. Ed. 126; The Richmond (D. C.) 114 Fed. 213, and cases cited; The Elizabeth (D. C.) 114 Fed. 757–9.

From respondent's evidence in this case, it is apparent that the Pocomoke failed to comply with the rules of navigation cited; indeed, she made no pretense of having done so, unless it be the ineffectual effort to observe article 23 when it was too late to avert the collision. The vio'ation of the rules is in effect conceded. The case set up by the respondent's answer, and sought to be established by the master of the Pocomoke, is in substance that, as the Pocomoke approached the Norfolk ferry slip, she observed the ferryboat for Portsmouth, over which she had the right of way, proceed out on her course; that as a matter of courtesy he gave way to this boat, starboarded, and passed under her stern between the shore and the ferryboat, when he observed the ferryboat from Berkeley approaching her slip, which latter boat had the right of way over the Pocomoke, but gave way to the latter steamer, which had rung up her engine, in order to pass under the stern of the Portsmouth boat; and the Pocomoke then proceeded across the course of the Berkeley boat, when suddenly the launch Daisy appeared from behind the Berkeley boat, and proceeded across the Pocomoke's course when too late for the latter to avoid the collision with her. It will thus be seen that the Pocomoke's master, by what he in his evidence termed a matter of courtesy, was proceeding in utter violation of all rules and regulations, in that he allowed the outgoing Portsmouth ferryboat, over which he had the right of way, to go across and ahead of his vessel, and he in turn did the same thing with the incoming Berkeley ferryboat, as he claimed, none of which he should have done. Upon the facts as stated by the master, the navigator of the launch, if behind the Berkeley ferry steamer, could not have anticipated that the Pocomoke would proceed ahead of and across the course of the incoming Berkeley boat, instead of under her stern.

Assuming the facts, however, to be as claimed by the master of the Pocomoke, upon his own showing he would not be relieved from responsibility for the collision, because he admits that, notwithstanding the sudden emerging of the launch from behind the Berkeley ferryboat, he saw her some 100 yards ahead of him when he was only proceeding at the rate of about 2 miles an hour; and he therefore had ample time, and it was his duty, to have avoided the collision with the launch. It is proper, however, to say that the evidence alike of the government and of the respondent entirely fails to establish the contention of the Pocomoke as to the presence and movements of the incoming ferryboat from Berkeley, or the sudden emerging of the launch from behind such boat. On the contrary, the facts are clear that there was no such boat present at all. The Berkeley ferryboat was then in her slip at Norfolk, according to respondent's own evidence; and there was no other ferryboat in the immediate vicinity, save the outgoing Portsmouth steamer, which the Pocomoke passed astern, instead of across

her bow, as she should have done. All of the government's witnesses make this clear, and the only witness examined by the Pocomoke, other than her master, namely, the master of the Berkeley ferryboat, then in the pilot house of the ferryboat in the slip and the observer of all that occurred, fully corroborates them. In other words, the master of the Pocomoke seems to have imagined that he saw an incoming ferry steamer, which goes far to destroy the force of his evidence as to just what occurred at and about the time of the collision. Indeed, it is quite apparent, from the whole evidence, that the Pocomoke was herself arranging to land at her dock just a short distance above the government landing, and was engaged about that after she rang up to pass astern of the Portsmouth steamer, and paying but little attention to her own navigation, which may in part account for her master's confusion, and her failure to call as witnesses to the occurrence those employed in her service. She did not so much as examine her lookout, which is difficult to account for, if it be really true that he, too, was at his post at the time of the collision. The Georgetown (D. C.) 135 Fed. 859, and cases cited.

The Pocomoke seeks to place the responsibility for the collision upon the launch, because, as she claims, the latter, as required by article 21, failed to keep her course and speed, and, on the contrary, slowed down and reversed her engine. This position, in the view taken by the court of the evidence and under the law on the subject, is wholly untenable. Whatever error the launch may have committed in this respect should be treated as error in extremis at most; but it is evident that the maneuver thus complained of on the part of the launch's navigator was one made by him when the collision was inevitable, with the view, if possible, of lessening the danger, by receiving a glancing blow, instead of a direct one, which it tended to and did do, and was what ought to have been done. The master of the launch, after explaining the circumstances of the collision and the fact that he was engaged immediately preceding it in closely observing the movements of two tugs having the right of way over him, to the end that he could keep out of their way, thus describes the coming together of the launch and the Pocomoke:

"I glanced up and saw the Pocomoke was right on top of me, coming up the river at full speed. I should judge she was making at least 6 or 7 miles an hour. Seeing a collision inevitable, and that she would strike me any way, for she was right on top of me, I gave my engineer three bells and the jingle right in succession, which signified to stop and go astern, and just as I gave the bells the Pocomoke struck me right forward of the engine room, between the pilot house and engine room hatch, and she hung on to us until all the crew and my four passengers got aboard. We crawled right over her bow. As soon as I got on board, she backed away, and she went down in half a minute after the Pocomoke backed away."

And then the witness, in answer to questions as to whether it was possible for him to have avoided the collision if he had kept his course and speed, said that it was inevitable, concluding:

"When I saw him, he was crossing onto me. If I had kept on going, he would have hit me in the engine room, and both my engineman and fireman would have been scalded to death."

This evidence was corroborated by the engineer on the launch, as well as the deck hand forward at the time of the collision; and by reason of this maneuver a glancing blow was made abaft of her wheelhouse, instead of amidship, as would otherwise have been the case. The danger arising from the coming together of the vessels was thus reduced to a minimum.

The effort of the Pocomoke to place the responsibility for the collision on the launch, because of her failure to have a proper lookout, it equally untenable. In the first place, if the accident arose because of the launch's stopping and reversing, instead of keeping her course and speed, as the Pocomoke claims, the presence or absence of a lookout would have been immaterial, as not contributing to the accident. The Ludvig Holberg, 157 U. S. 60, 15 Sup. Ct. 477, 39 L. Ed. 620; The Georgetown (D. C.) 135 Fed. 857; Baltimore Steam Packet Co. v. Coastwise Transportation Co. (D. C.) 139 Fed. 777. But the launch was justified under this evidence in making the maneuver which she did, instead of continuing on her course and speed; and it does not lie in the mouth of the Pocomoke, after placing her in this perilous position, to take advantage of her effort to extricate herself from the danger. The launch, however, was properly manned and officered, and had a sufficient lookout. It was a small launch, only 61 feet long, with her pilot house well forward, in which her navigator stood, with windows all around him open, from which he could see up, down, and across the river; and, in addition, a deckhand was aft and one forward of the pilot house, the latter's duty being especially to look out in foggy weather, and who at the time was standing forward with his heaving line in his hand ready to throw it ashore when he arrived at the landing. He, as well as the navigator of the launch, could see everything around them. It was broad daylight, good weather, and about 9 o'clock in the morning, and they had their view especially upon vessels that the law required them to look out for, without expecting that others in similar position would fail to observe and respect the proper rules of navigation on their part. The presence of the tugs having the right of way over the launch was as much discernible to the Pocomoke's navigator as to that of the launch, and the Pocomoke should have exercised the vigilance the circumstances in which the launch was then placed required, and have especially kept out of the launch's way. Wilder S. S. Co. v. Low, 112 Fed. 171, 172, 50 C. C. A. 473, and cases cited.

This was the condition under which the Pocomoke negligently and recklessly ran into the launch. An additional or special lookout would have served no good purpose, and, indeed, it would have been impracticable, with the size of the launch, to have kept a special lookout. He would have been in the way. All the law requires as to a lookout is that there shall be some one properly stationed to best observe, see, and hear the approach of other vessels. Taking into account the size of this launch, the business in hand, and the waters to be traversed, certainly in this case no other or additional person to the master and deckhand was required or needed as lookout. The Farragut 10 Wall. (U. S.) 334, 19 L. Ed. 946; The Fannie, 11 Wall. (U. S.) 238, 243, 20 L. Ed. 114; The Dexter, 23 Wall. (U. S.) 69, 74, 25 L. Ed.

91; .The Nacoochee, 137 U. S. 330, 11 Sup. Ct. 122, 34 L. Ed. 687; The Blue Jacket, 144 U. S., 371, 389, 12 Sup. ·Ct. 711, 36 L. Ed. 469; Ping-On v. Blethen (C. C.) 11 Fed. 607; The Bermuda, (D. C.) 17 Fed. 397; The George Murray (D. C.) 22 Fed. 117, 122; The Caro (D. C.) 23 Fed. 734; The Havana (D. C.) 54 Fed. 411; The City of Portsmouth (C. C. A.) 143 Fed. 856.

In The Farragut, 10 Wall. (U. S.) 338, 19 L. Ed. 946, Mr. Justice Bradley, speaking for the Supreme Court, said:

"But it would be against ·all reason to contend that the master or owners of a vessel should be made liable for the consequences of an accident by reason of not having a special lookout, where the collision or loss could not have been guarded against by a lookout, or where it is clear that the absence of a lookout had nothing to do in causing it. * * * We are not to shut our eyes and to accept blindly an artificial rule which is to determine in all cases whether the navigator is liable to the charge of negligence in causing any damage that may happen. A lookout is only one of the many precautions which a prudent navigator ought to provide; but it is not indispensable where, from the circumstances of the case, a lookout could not possibly be of any service. The object of a lookout is to discover dangers that are unknown, the advance of an approaching vessel, the appearance of a light on the coast, the discovery of a dangerous object, and many other things, the existence and presence of which could not be so easily and quickly known to the pilot as to a person whose sole business it was to make and communicate such discoveries The cases referred to, taken in connection with the particular circumstances of each, cannot receive a different interpretation."

In The Dexter, 23 Wall. (U. S.) 69, 74, 25 L. Ed. 91, Mr. Justice Clifford, speaking for the Supreme Court, said:

·"Objection is made by the libelant that the lookout of the Dexter was insufficient; but it is unnecessary to decide the question, as it was a clear night, and as each vessel was seen by the other long before there was any necessity for precaution, and in ample time before the collision to have done whatever the circumstances required to have prevented the disaster. Sufficient lookouts are required by the rules of navigation; but where it appears that the officer in charge of the deck saw the approaching vessel while she was yet so distant that no precautions to avoid a collision had become necessary, and that the want of a lookout did not and could not have contributed to the collision, the vessel omitting such a proper precaution will not be held responsible for the consequences of the disaster, if in all other respects she is without fault."

' It will be observed that this latter authority would go far to relieve even the Pocomoke, the burdened vessel ·n this case, from liability on account of the absence of the lookout, assuming she was without one, which may account for the failure to produce him as a witness, since the Pocomoke's master admits seeing the launch at least 100 yards away, which was in ample time to avoid either a collision or the danger of one; but just upon what reason loss should be visited upon the launch, the favored vessel, because of the absence of a special lookout under such circumstances, cannot be well conceived of.

The City of Portsmouth, 143 Fed. 856, was a decision of the Circuit Court of Appeals for this circuit, upon appeal from a judgment of this court, and in which the appellate court concluded that there should have been a division of damages, because in that case, in the condition of the .wind and tide, and at the hour of 2 o'clock at night, with one of the line of steamers plying between Portsmouth and Norfolk, without a lookout, and with only the master and a deckhand on duty, both

at the wheel, a special lookout would have sooner discerned the towing light of the tug in collision with the ferryboat, and thus lessened the danger of the situation. This decision negatives the idea of its being necessary to have a special person designated as lookout, even in the case of a large ferryboat of the size of the City of Portsmouth. The court in that case considered that the presence of the lookout would have been desirable, as minimizing the chances of danger; but no such contention can be maintained in this case, with a craft the size of the launch, in broad daylight, with good weather conditions, the master at the wheel, with nothing to obstruct his view, and the deckhand located in front of him. Here no harm came from the failure of those on the launch to do or the omission to do anything, but it arose because the Pocomoke, the burdened vessel, with the launch in full view of her and observed for at least 100 yards, chose either to run into and over the launch or to approach her in such close proximity as not to be able to avert the collision, which she was charged with the duty of avoiding.

The effort on the part of the Pocomoke to avoid the consequences of her own negligence by casting a doubt or suspicion upon the management of those in charge of the launch will not serve to relieve her from responsibility therefor. The launch had the right of way. The Pocomoke was the burdened vessel, and as such was guilty of a clear violation of the rules of navigation, which in itself was sufficient to account for the accident, and cannot, therefore, escape liability by merely raising a doubt as to the conduct of the launch. Doubts should be resolved in favor of the launch, and against the Pocomoke, under such circumstances. The City of New York, 147 U. S. 72, 13 Sup. Ct. 211, 37 L. Ed. 84; The Oregon, 158 U. S. 197, 15 Sup. Ct. 804, 39 L. Ed. 943; The Victory and Plymouthian, 168 U. S. 410, 18 Sup. Ct. 149, 42 L. Ed. 519; The Georgetown (D. C.) 135 Fed. 857, and cases cited; Baltimore Steam Packet Co. v. Coastwise Trans. Co. (D. C.) 139 Fed. 777.

It follows, from what has been said, that the collision in this case arose solely from the negligence of the Pocomoke, and a decree may be entered so determining.